**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 21-1458

---

JOHN DOE
Appellant

v.

PRINCETON UNIVERSITY

---

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-20-cv-04352)
District Judge: Honorable Brian R. Martinotti

---

Argued November 10, 2021

Before: HARDIMAN, PORTER, and MATEY, *Circuit Judges*

(Filed: March 23, 2022)

Michael P. Bowen **[Argued]**
Edward E. Shapiro
Glenn Agre Bergman & Fuentes LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
*Counsel for Appellant*

Stephen J. Kastenberg **[Argued]**
Christopher Kelly
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
*Counsel for Appellee*

---

OPINION OF THE COURT

---

MATEY, *Circuit Judge*.

There are two sides to every story. But a complaint need not tell both. John Doe's Complaint plausibly tells his side, alleging that Princeton discriminated on the basis of sex while investigating Title IX claims filed against him. Discovery might not bear out Doe's account, but he has satisfied his burden at this early stage. So we will vacate the District Court's order dismissing the matter and remand for the rest of the story to develop.

## I.

On a motion to dismiss, a court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). Following that rule, we recount only the facts described in the Complaint.

### A. The Beginning

John Doe and Jane Roe attended Princeton University where, after meeting during the fall of their freshman year, they began a steady, and steadily volatile, relationship. Arguments, sometimes violent, were common. During their first summer vacation, for example, Roe scratched and grabbed Doe's arm while traveling with Doe's family. And in what became part of Princeton's investigation, the couple's penchant for physical altercations extended to intimacy, including "consensual choking." (App. at 43.)[1] Soon enough, bad went to worse and,

[1] Although associating violence with intimacy might seem a contradiction, we note publications describing the campus culture during this period. For example, a Princeton website states that in December 2017, the Office of the Dean of Undergraduate Students officially recognized "Princeton Plays" as "the only kink and BDSM community on campus." *Interview with Princeton Plays*, Ask the Sexpert (Feb. 28, 2019), https://thesexpert.princeton.edu/2019/02/interview-with-princeton-plays/; *see also* Ivy Truong, *New BDSM club shows its members the ropes*, The Daily Princetonian (Dec. 6, 2017), https://web.archive.org/web/20180811193926/http://www.dailyprincetonian.com/article/2017/12/princeton-plays.

when Roe informed Doe she was dating others, Doe called the whole thing off. Except, it turned out, Doe had also been unfaithful. A revelation that did not sit well with Roe, so she began spreading rumors about Doe on campus. One such accusation: that Roe ended the relationship because Doe was physically abusive. And she threatened Doe directly: "take a year off and nothing will happen to you." (App. at 48.)

### B. Princeton Intervenes

Concerned, Doe went to the Director of Student Life, Garrett Meggs. In an email, Doe complained that he was being harassed by his ex-girlfriend, who was "spreading false information." (App. at 48.) Doe explained that he "simply" did not "feel safe" and Meggs recommended that Doe seek mental health services. (App. at 48.) He did not recommend that Doe file a Title IX complaint.

Meanwhile, Roe met with Princeton's Director of Gender Equity and Title IX Administration, Regan Crotty. Roe told Crotty that she was a victim of "Intimate Relationship Violence" under the Princeton Policy[2] and described certain incidents of abuse by Doe. Roe explained that she was not interested in pursuing further action. But Crotty advised that Princeton wanted Roe to press charges against Doe. Soon after, when Doe began a new relationship, Roe agreed to Crotty's suggestion, and approved an order ("Order") prohibiting Doe

[2] Princeton's *Rights, Rules, Responsibilities* policy ("Princeton Policy") defines "Intimate Relationship Violence" as "[a]cts of violence, threat or intimidation that harm or injure a partner in a current or former intimate relationship." (App. at 118.) *But cf. supra* note 1.

and Roe from any contact. Still, on the day the Order issued, Roe approached Doe on a campus running trail, attempting to apologize. Doe notified Meggs of the incident, and the violation of the Order, and Princeton simply told Roe not to let it happen again.

A few months later, Roe notified Crotty that she would cooperate with Princeton's inquiry. A formal notice was issued, and Princeton barred Doe—but not Roe—from campus during the investigation. Then, several months later, Doe accidentally "liked" one of Roe's social media posts, in violation of the Order. Doe immediately self-reported the mistake but, unlike with Roe's violation, Princeton launched another disciplinary process that resulted in a reprimand and a written warning from a dean.

### C. The Investigation and Report

Princeton appointed a three-person panel ("Panel") to investigate Roe's allegations against Doe,[3] review the evidence they gathered, weigh the testimony they allowed, and then decide whether the facts they found violated the Princeton Policy. At one of Doe's meetings with the Panel, he mentioned an interest in pursuing counterclaims against Roe. Unlike with Roe, who was urged to pursue an investigation, Princeton offered Doe no guidance. Later, when Doe formally asked the

---

[3] Whether Doe engaged in Intimate Relationship Violence by: a) repeatedly grabbing and pinching Roe between September 2016 and March 2018, b) choking Roe in September and October 2017, c) pulling Roe's arm and pushing her to the ground in 2019, and d) threatening self-harm if Roe did not remain in a relationship with him.

Panel to consider his claims, the Panel expanded its investigation.[4]

The Panel's investigation culminated in a "Report" finding evidence to support the incidents of physical abuse alleged by Roe,[5] but nothing sufficient to confirm any of Doe's claims. Doe received a letter with the Panel's punishment: expulsion from Princeton.[6] Vindicated, Roe tweeted "my life is good again . . . worked out boy problems that were never real problems just things I created." (App. at 56.)

### D. The Federal Complaint

In April 2020, Doe filed a Complaint against Princeton alleging violations of Title IX, and state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and denial of due process. The District Court granted Princeton's motion to dismiss all of Doe's claims without prejudice, offering Doe an opportunity to amend. *See Doe v. Princeton Univ.*, 2021 WL 194806, at *12 (D.N.J. Jan 20, 2021). Doe declined, so the District Court dismissed his

[4] Doe alleged that Roe scratched him multiple times, punched him, and elbowed him in the face.

[5] The Panel found insufficient evidence that Doe linked the threat of self-harm to Roe remaining in a relationship with him.

[6] Doe appealed and the Panel's decision was affirmed by a separate three-member faculty group.

action with prejudice. Doe filed this timely appeal.[7] For the reasons below, we will vacate.

## II.

We review the grant of a motion to dismiss de novo. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("*USciences*"). To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That requires "plausibly suggesting" facts sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Our review must accept Doe's factual allegations as true and consider those facts in the light most favorable to Doe. *See USciences*, 961 F.3d at 208, 210 n.3. But we "disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).

### A. The Princeton Report

We note two complications that may arise when evaluating a complaint under Rule 12(b)(6): whether a district court may consider documents outside of the pleadings and, if so, whether the district court may disregard the well-pleaded facts of a complaint in favor of facts in an external document.

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a) and we have jurisdiction under 28 U.S.C. § 1291. Doe does not appeal the dismissal of his due process claim.

Doe alleges that the District Court impermissibly credited findings in the Report as true, despite his Complaint's assertions to the contrary. These findings included the Report's statements that "[t]he Panel found Jane credible," there were "significant concerns" with Doe's credibility, and all other witnesses were "generally credible." (App. at 13.)

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But where a document is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Rule 56. *USciences*, 961 F.3d at 208 (quoting *Burlington*, 114 F.3d at 1426). Because the Panel Report was "integral to" and "explicitly relied upon in the [C]omplaint," consideration is appropriate. But consideration only goes so far. When the truth of facts in an "integral" document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail.

To see why, start with *Twombly* and *Iqbal*. They direct courts to "accept[] as true" the factual assertions of a complaint. *Iqbal*, 556 U.S. at 678. This guidance remains "even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Twombly*, 550 U.S. at 556). The proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment. *See Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175–76 & n.9 (3d Cir. 2015).

We have held, for example, that "we may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *see also Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 118–19 (3d Cir. 2019). So, too, with a public record, which may be considered "not for the truth of its contents, but rather as evidence of the information provided [that was relevant to the dispute]." *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007); *see also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). Similarly, concessions by counsel may not be used in a motion to dismiss to decide disputed issues of material fact. *See Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 197–98 (3d Cir. 2019). And neither may testimony given at a hearing. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016).

*USciences* reflects this approach. There, we accepted facts in the university's Title IX investigator's report as true when they were not disputed by the complaint. But not facts challenged by the plaintiff. For example, we credited the report's assertion of how many drinks Doe and Roe consumed on the relevant night. *See* 961 F.3d at 210. But where the complaint alleged that Doe and Roe "were comparably intoxicated [which] undermined [their] ability to give affirmative consent," we did not rely on the report's contrary assertion that "Doe . . . told the investigator that [the] sexual encounter . . . was mutually consensual." *Id.* at 210 n.4.[8]

---

[8] Other circuit courts agree. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018)

Here, the District Court noted that the Panel's "credibility determinations were supported by sufficient evidence." (App. at 13.) That finding contradicted Doe's assertion that the Panel rendered "inconsistent credibility determinations." (App. at 63, 85.) As a result, crediting the Report's assertion over the Complaint's was improper.

### B. Title IX Claim

Title IX of the Education Amendments of 1972 states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). That "bar[s] the imposition of university discipline when sex is a motivating factor in the decision to discipline." *USciences*, 961 F.3d at 209 (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).

---

("Although incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."); *Otis v. Demarasse*, 886 F.3d 639, 647 (7th Cir. 2018) ("The district court . . . erred when it credited the content of the police report over [the plaintiff's] denial."); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015) ("Ignoring, as we must at the pleading stage, the opinions and conclusions of [a document incorporated by reference].").

To state a claim under Title IX, Doe must allege facts that, if true, support a plausible inference that Princeton discriminated against him based on his sex. *USciences*, 961 F.3d at 209. While Doe is "free to characterize [his] claims however [he] wish[es]," he alleges facts that mirror the categories in *USciences*: 1) whether sex was a motivating factor in Princeton's investigation and 2) whether Princeton yielded to external pressure when implementing and enforcing its policy against him. *USciences*, 961 F.3d at 209. And based on those facts, Doe has stated a plausible claim for relief.

1. Doe Plausibly Alleged that Sex was a Motivating Factor

Doe points to two incidents to allege that sex was a motivating factor in Princeton's investigation: Roe's report of misconduct was treated with greater urgency and seriousness than his own, and Roe's violation of the Order produced only a mild University response.[9]

*i. Reported Misconduct*

Begin with Doe's argument that Princeton favored Roe's initial report. He alleges that while Crotty encouraged Roe to file a formal Title IX complaint, Meggs steered Doe towards mental health services. The District Court found this insufficient because "Plaintiff does not allege he filed a complaint to trigger such an investigation." (App. at 13.) That

[9] Doe also argues the Panel credited nearly all female witnesses but discredited nearly all male witnesses. As that point is raised in his brief, but not his Complaint, we do not consider this argument.

might be a plausible and nondiscriminatory reason for treating Doe's Complaint differently.[10] But on a motion to dismiss, we must "construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). So while the District Court's explanation is plausible, the "plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. Indeed, though "anti-male bias is not the only plausible explanation for the university's conduct, or even the most plausible[,] . . . alternative explanations are not fatal to Doe's ability to survive a Rule 12(b)(6) motion to dismiss." *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018); *see also Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020) ("Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed."); *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 579 (8th Cir. 2021); *Columbia Univ.*, 831 F.3d at 57.

Princeton replies that Doe's allegation of mere "rumor spreading" went un-investigated because it did not violate the Princeton Policy. That misses the mark. The Princeton Policy prohibits "harassment" and Doe's Complaint alleges that he reported "that he was being harassed by his ex-girlfriend" and "simply" did not "feel safe." (App. at 48, 108–09, 117–18.) And even if the conduct Doe alleged did not constitute "harassment," the Princeton Policy also proscribes "[u]nwelcome or inappropriate conduct that does not fall under

[10] Even if a peculiar one, given that the Princeton Policy states that the "[l]ack of a formal complaint does not diminish the University's obligation to respond to information suggestive of sex discrimination or sexual misconduct." (App. at 114.)

other forms of sexual misconduct, but that is sexual and/or gender-based in nature." (App. at 118.) Doe has plausibly alleged that he reported a violation that was not investigated by the University. And that, in turn, plausibly supports the inference that sex was a motivating factor in Princeton's investigation.

*ii. Order Violations*[11]

Next, Doe argues that Princeton's response to violations of the Order suggests sex discrimination. The parties do not dispute that Roe's intentional in-person contact was dismissed as minor, while Doe's accidental "like" was met with formal disciplinary process. But the District Court relied on a brief submitted by Princeton—which asserted that Doe was treated differently because the "like" was not his first violation—to dismiss this fact. Doe's Complaint omits this story entirely.[12] What to do?

First, a court reviewing a motion to dismiss must examine the plausibility of "allegations in the complaint." *Twombly*, 550 U.S. at 555. Factual claims and assertions raised

---

[11] The Panel Report references two orders, one called "No Contact" and one labeled "No Communication." But the Complaint treats both as part of the same administrative response, and at this stage we accept that as true.

[12] Princeton's brief walks up to, but not over, the line in suggesting that Doe intentionally omitted this material fact from his Complaint. But a motion to dismiss is not the proper way to raise, let alone resolve that charge. Princeton may, of course, pursue this theory in a separate motion under Rule 11 or 56.

by a defendant are not part of that scrutiny. Otherwise, every motion to dismiss would become one for summary judgment, a step permitted only under the process outlined in Rule 12(d). *See Bruni*, 824 F.3d at 361 ("[I]t is reversible error for a district court to convert a motion under Rule 12(b)(6) . . . into a motion for summary judgment unless the court provides notice of its intention to convert the motion and allows an opportunity to submit materials admissible in a summary judgment proceeding or allows a hearing." (quoting *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989))). Disregarding Doe's well-pleaded facts in favor of those mentioned in Princeton's brief was erroneous. Second, even if it were permissible to consider the fact mentioned in Princeton's brief, the District Court should not have found it dispositive. Though Princeton suggests another explanation for why it treated the violations differently, anti-male bias is still a plausible explanation. And we must construe the facts in the light most favorable to Doe at this stage. *See Phillips*, 515 F.3d at 233.

2. Doe Plausibly Alleged that Princeton Yielded to External Pressure

Doe also plausibly contends that, in implementing the Princeton Policy, the University succumbed to external pressure. Doe alleges that Princeton was "under tremendous pressure to respond aggressively and 'over-correct' by favoring protection of female accusers at the expense of finding male respondents guilty" after the Department of Education ("DoEd") published its 2011 Dear Colleague Letter ("2011 DCL"), and the Office for Civil Rights launched a related investigation into Princeton's Title IX processes. (App. at 77–79.) As others have noted, the 2011 DCL "ushered in a more rigorous approach to campus sexual misconduct

allegations." *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019); *see also Univ. of Minn.*, 999 F.3d at 578; *Menaker v. Hofstra Univ.*, 935 F.3d 20, 26 (2d Cir. 2019). The DoEd "made clear that it took the letter and its enforcement very seriously." *Purdue Univ.*, 928 F.3d at 668. If schools did not comply, their "federal funding was at risk." *Id.*; *see also USciences*, 961 F.3d at 213–14.

That allegation is relevant because, while "pressure from DoEd and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination," it factors into the total mix of information supporting a plausible Title IX discrimination claim. *See USciences*, 961 F.3d at 210. When coupled with Doe's allegations about Princeton's selective handling of the misconduct reports and Order violations, the Complaint states a plausible claim of sex discrimination. *See id.*; *see also Purdue Univ.*, 928 F.3d at 668–71; *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018); *Univ. of Minn.*, 999 F.3d at 578–79; *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 937–38 (9th Cir. 2022).

For these reasons, Doe has suitably alleged plausible Title IX allegations and dismissing these claims was improper.

### C. State Law Claims

Doe also appeals the dismissal of his two state law claims: breach of contract and breach of the implied covenant of good faith and fair dealing. Both state viable causes of action.

1. Breach of Contract

Doe alleges that the University breached the Princeton Policy by failing to investigate in an "impartial and unbiased" manner. (App. at 89.) New Jersey courts do not describe "the relationship between a private university and its students . . . in pure contract or associational terms." *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 696 (N.J. Super. Ct. App. Div. 1998). Instead, "[t]he relationship is unique." *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. Ct. App. Div. 1982). Following that approach, New Jersey courts "have warned against a rigid application of the law of contracts to students' disciplinary proceedings." *Id.* We consider that malleable standard by reviewing the circumstances giving rise to contract claims in educational settings.

Start with cases involving private university dismissals for poor academic performance. New Jersey courts have described their role as "limited," *Mittra*, 719 A.2d at 697, because of the "independence that should be accorded to a university to permit it to exercise properly educational responsibility," *Napolitano*, 453 A.2d at 273. *See also Hernandez v. Overlook Hosp.*, 692 A.2d 971, 975 (N.J. 1997) ("Assessing a student's academic performance must be left to the sound judgment of the individual academic institution."). As a result, New Jersey courts ask whether "the student [was] afforded reasonable notice and a fair hearing in general conformity with the institution's rules and regulations." *Mittra*, 719 A.2d at 694. And ultimately, a university must have "sufficient evidence" to expel. *See Hernandez v. Don Bosco Preparatory High*, 730 A.2d 365, 375 (N.J. Super. Ct. App. Div. 1999). But *Napolitano* also distinguished between cases "involving academic standards" and those involving a

"violation of [the] rules of conduct." *Napolitano*, 453 A.2d at 273. And no New Jersey court has directly addressed whether a student expelled from a private university for misconduct, rather than poor academic performance, may bring a state law contract claim.

But *Don Bosco* noted that, when adjudicating a dismissal for misconduct, courts should consider whether the school "follow[ed] its own established procedures for expulsion," a standard much like that for academic dismissals from universities. 730 A.2d at 367. And because of the "harm[]" that "plac[ing] [a] child in academic limbo" may pose, *B.S. v. Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *6 (N.J. Super. Ct. App. Div. Aug. 5, 2016) (per curiam), the school "must follow a procedure that is fundamentally fair," *Don Bosco*, 730 A.2d at 367. *Don Bosco* also distinguished between the rights of high school and university students because of the greater harms associated with expulsion from college. *Id.* at 375. The court explained that "[a] student at a private university, if expelled during the semester . . . loses academic credit for the entire semester" and "must complete applications for admission to another university in order to complete the expected degree," while "[a]n expelled student in a private high school . . . may transfer immediately to the local public high school" and "will not lose credit for the semester." *Id.* Given those added harms, "the procedural rights of a private university student will be more aggressively protected by the courts when compared to the procedural rights of an expelled student at a private high school." *Id.* at 376.

We need not outline all of the "more aggressive[]" protections that private university students retain under New Jersey law. It is enough to follow the direction of *Don Bosco*

and hold that New Jersey law requires at least that the school "follow its own established procedures," *id.* at 367, 376; *see also Mittra*, 719 A.2d at 694, and that those procedures be "fundamentally fair," *Don Bosco*, 730 A.2d at 367, 376; *see also Mittra*, 719 A.2d at 694; *Romeo v. Seton Hall Univ.*, 875 A.2d 1043, 1045, 1048 (N.J. Super. Ct. App. Div. 2005) (applying *Mittra* standard to student's claim that university breached contract by failing to recognize a student group).

Under that baseline standard, Doe plausibly alleges that Princeton failed to adhere to its own disciplinary procedures in the Princeton Policy on proof and impartiality. First, the Princeton Policy guarantees that, after considering the "totality of the facts and circumstances," (App. at 116), "[t]he investigative panel will . . . determine, by a preponderance of the evidence, whether [the] policy was violated," (App. at 132). A familiar standard, preponderance of the evidence requires proof by the "greater weight of the evidence." *See Preponderance of the Evidence*, Black's Law Dictionary (11th ed. 2019). "[A] party proves a fact by a preponderance of the evidence when he proves that the fact's existence is more likely than not." *Greenwich Collieries v. Dir., Off. of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993). While the evidentiary showing need not be "overwhelming," *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir. 1983), a plaintiff may not prevail where the "evidence is closely balanced" or "inconclusive," *Syblis v. Att'y Gen.*, 763 F.3d 348, 357 (3d Cir. 2014).

Doe alleges that the Panel ignored that standard by disregarding evidence that tended to inculpate Roe and exculpate Doe. His Complaint notes that the Panel's decision failed to "consider[] the entirety of the evidence with a neutral

gaze," "disregarded exculpatory evidence[,] and rendered inconsistent and skewed credibility determinations." (App. at 70.) Though the Report claims to apply the preponderance standard, we must credit the Complaint's factual allegations. And "[f]rom these allegations, we draw the reasonable inference that [Princeton] failed" to follow its own procedures by assessing whether Roe's allegations were true by a more likely than not standard. *USciences*, 961 F.3d at 215.

Doe also alleges breaches of the Princeton Policy's promise that "[t]he panelists will . . . be impartial and unbiased." (App. at 132.) Because the Princeton Policy does not define those terms, "we must construe [Princeton's] promise as a matter of contract interpretation." *USciences*, 961 F.3d at 212. Our focus is the parties' intent expressed in their words, and "[w]e look to the dictionary definition[s] . . . for assistance in determining the plain meaning of th[ese] undefined term[s]." *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 360 (3d Cir. 2014) (cleaned up). "Partial" means "inclined to favor one party more than the other." *See Partial*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014); *see also Partial*, Black's Law Dictionary (11th ed. 2019) ("Unfairly supporting one person, group, or organization against another; predisposed to one side of an issue."). And "bias" or "biased" refers to "a settled and often prejudiced outlook." *See Bias*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014); *see also Bias*, Black's Law Dictionary (11th ed. 2019) ("A mental inclination or tendency; prejudice; predilection."). "We can glean from these definitions that the plain meaning of the term," *Aleynikov*, 765 F.3d at 360, "impartial" is one who does *not* favor one side or the other. And the "plain meaning" of the word "unbiased" is one *without* a prejudice or inclination in favor of one party.

Ordinary meanings in mind, Doe complains that the Panel "applied inconsistent standards to assess [Roe]'s and [Doe]'s credibility," (App. at 64), "overlooked or minimized glaring and substantial factors that would tend to undermine [Roe]'s veracity . . . including . . . her motivations to lie," (App. at 64), and "disregarded compelling exculpatory evidence which contradicted [Roe]'s allegations," (App. at 68). He also points to Princeton's single investigator model,[13] which he contends is "intrinsically flawed and incompatible with a fair investigation." (Opening Br. at 40.) Taken as true, these facts suggest that Princeton failed to provide Doe the promised fair and impartial proceeding.[14] That is enough to ground Doe's breach of contract claim.

---

[13] Under the single investigator model, a university often "hires an outside attorney to serve as an investigator" and "then tasks the investigator with interviewing witnesses, gathering evidence, and determining the accused's culpability." *USciences*, 961 F.3d at 206. Princeton tasked a panel of three university employees with conducting the investigation.

[14] We need not accept Doe's suggestion that Princeton failed to follow a "fundamentally fair" procedure solely by omitting a live hearing. While the bright-line test Doe urges would provide precision, New Jersey courts have defined fundamental fairness contextually, focusing on the setting and circumstances. *See Don Bosco*, 730 A.2d at 376. So while academic decisions and secondary school expulsions are subject to fewer procedural requirements, *see Napolitano*, 453 A.2d at 274 (allegations of plagiarism); *Overlook*, 692 A.2d at 975 (termination from medical residency program), non-

2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, the Complaint alleges that Princeton violated the covenant of good faith and fair dealing. In New Jersey, "[e]very contract contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002). The implied covenant prohibits either party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). Relevant here, the covenant "allow[s] redress for the bad faith performance of an agreement." *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1076 (N.J. Super. Ct. App. Div. 2002). Doe plausibly alleges facts suggesting the University acted in bad faith.

The Complaint states that Princeton "[s]ubject[ed] [Doe] to a discriminatory disciplinary process," "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe]," "constru[ed] all discrepancies and inconsistencies in [Roe's] favor," and "ignor[ed] evidence corroborative of [Doe's] counter claims." (App. at 91.) All sufficient, at this stage, to allege improper performance. The District Court read these allegations to share

academic private university disciplinary matters warrant "more aggressive[] protect[ion]." *Don Bosco*, 730 A.2d at 376. But sketching all the "aggressive[] protect[ions]" that might be required is unnecessary where, as here, the total mix of procedures missing from Princeton's investigation is sufficient to state a claim.

facts with Doe's contract claims. But factual overlap is not fatal. While both claims share some events and circumstances, we "view[] the pleadings with liberality" at this stage, *Seidenberg*, 791 A.2d at 1080, and find they are not "redundant" of one another, *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, 2006 WL 2162435, at *10 (N.J. Super. Ct. App. Div. Aug. 3, 2006) (per curiam).[15] So Doe has done enough to proceed.[16]

## III.

Doe's Complaint provides sufficient factual allegations to state a claim for relief under both Title IX and New Jersey state law. We will vacate and remand to the District Court for proceedings consistent with this opinion.

---

[15] And even if they were, New Jersey courts "permit the pleading and pursuit of alternative and even inconsistent theories." *Kas Oriental Rugs, Inc. v. Ellman*, 926 A.2d 387, 393 (N.J. Super. Ct. App. Div. 2007). They prohibit only double recovery. *See id.*; *Kluczyk v. Tropicana Prod., Inc.*, 847 A.2d 23, 31–32 (N.J. Super. Ct. App. Div. 2004).

[16] By contrast, an implied covenant claim arising from the Panel's "contravention of the preponderance of the evidence standard" would fail because Doe pleads the same fact in support of his contract claim. (App. at 91, 89.)